UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IRENE TSEPENYUK,                      :
                                      :
                Plaintiff,            :          **Civil Action No.**
                                      :          **Jury Trial Demanded**
        -against-                     :
                                      :
FRED ALGER & COMPANY, INC.,           :
                                      :
                Defendant.            :

---

**PLAINTIFF IRENE TSEPENYUK**, by her attorney Goddard Law PLLC, whose offices

are located at 39 Broadway, Suite 1540, New York, NY10006, alleges upon knowledge with

respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action brought on behalf of Plaintiff against Defendant Fred Alger &

Company, Inc. (hereinafter referred to as "Defendant"), for gender and pregnancy discrimination

and retaliation in violation of Title VII and the Pregnancy Discrimination Act ("PDA"), the New

York Executive Law, and the New York City Administrative Code together with any and all other

causes of action which can be reasonably inferred from the facts as set forth below.

## PARTIES

2.      Plaintiff Irene Tsepenyuk (hereinafter referred to as "Plaintiff") is a female citizen

of the United States who currently resides at 5192 Hylan Boulevard, Staten Island, NY 10312 and

who was formerly employed by Defendant as a Corporate Accountant. Plaintiff was pregnant

and/or an individual with family caregiving responsibilities at all relevant times.

3.      Upon information and belief, at all times herein, Defendant is and has been a

corporation licensed to do business under the law of the State of New Jersey, with approximately

30 employees, and with offices located at Harborside Financial Center, 600 Plaza One, Jersey City, NJ 07311-4041, upon information and belief, now known as 150 Hudson Street, which has been engaged in, inter alia, the investment management business. Upon information and belief, Defendant's headquarters are located at 360 Park Avenue South, New York, NY 10010.

## JURISDICTION, VENUE AND PROCEDURAL REQUIREMENTS

4.      This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendant's discrimination of Plaintiff based on pregnancy and sex, as well as Defendant's retaliation and wrongful discharge of Plaintiff.

5.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds $75,000.00 exclusive of costs and interests.

6.      Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

7.      This Complaint is brought pursuant to Article 15 of the New York Executive Law, specifically Exec. Law §§ 290 et seq., (the 'Executive Law"), which is known as the Human Rights Law, to redress discrimination with respect to terms and conditions or privileges of employment.

8.      This Complaint is additionally brought pursuant to the New York City Administrative Code §§ 8-101 et seq., (the "Administrative Code") to redress discrimination with respect to terms and conditions or privileges of employment.

9.      This Complaint is additionally brought pursuant to the New Jersey Law Against Discrimination ("NJLAD") to redress discrimination with respect to terms and conditions or privileges of employment.

10.     Plaintiff seeks to recover the attorneys' fees incurred by this lawsuit pursuant to the above referenced statues.

11.     This Complaint is additionally brought pursuant to any other cause of action which

can be inferred from the facts set forth herein, including assault.

12.    Plaintiff demands a jury trial.

## STATEMENT OF THE CASE

13.    This is a proceeding to enforce the rights of Plaintiff and other persons similarly situated to equal employment opportunities, their rights as employees and their civil rights as citizens of the United States. Plaintiff seeks money damages, as well as an injunction restraining Defendant from maintaining a policy, practice, custom and/or usage of:

   a. Discrimination against Plaintiff and other persons similarly situated because of sex and/or pregnancy, with respect to compensation, terms, conditions, and privileges of employment, including without intending to limit, hiring, transfer, promotion and pay; and

   b. Limiting, segregating, and classifying employees of Defendant in ways which deprive Plaintiff and other persons similarly situated of equal employment opportunities and/or otherwise adversely affecting their status as employees because of sex and/or pregnancy.

   c. Subjecting Plaintiff and other persons similarly situated to discrimination, retaliation, and a hostile work environment.

14.    The Defendant has consistently and/or purposefully and/or negligently deprived Plaintiff and other persons similarly situated of the rights guaranteed to them with the intent and design, both directly and indirectly, of fostering a hostile work environment and gender and pregnancy discrimination to the detriment of Plaintiff and other persons similarly situated.

## FACTUAL BACKGROUND

15.    Plaintiff was employed at Defendant at all relevant times.

16.    Plaintiff is an employee, and Defendant is an employer, within the meaning of 42

U.S.C. § 2000e-(b).

17.    Plaintiff was willing and able to perform her employment duties and obligations and was qualified for the employment position(s) she held at Defendant.

18.    Defendant was, at all times relevant herein, an "employer" within the meaning of 42 U.S.C. § 2000e-(b).

## OPERATIVE FACTS

### Plaintiff is Hired By Defendant and Learns That They are an "Old Boys Club" With No Female Management

19.    On or about August 2, 2010, Plaintiff began working for Defendant as a Corporate Accountant.

20.    Plaintiff brought to Defendant several years of extensive experience in her field, including work as a Financial Analyst at JP Morgan Chase, and Staff Accountant at Bear Sterns Investment Bank. She graduated with Honors from Pace University Lubin School of Business with a BBA in Public Accounting, with a Minor in Business Management. Plaintiff received a certification in Management Training.

21.    Plaintiff accepted a starting salary of just $60,000 on the premise that she would earn bonuses, and that she would have ample opportunity to receive a promotion.

22.    When Plaintiff started at Defendant, she was disappointed to find that the only other women at the firm were lower-level employees, secretaries, or support staff. Upon information and belief, Defendant rarely, if ever, hires female managers. Furthermore, upon information and belief, male employees are paid a higher salary and promoted more than female employees with the same or lesser qualifications.

### Defendant Gives Plaintiff's Male Maternity Leave Replacement a Higher Salary and a More Senior Title

23.    On or about March 2011, Plaintiff discovered that she was pregnant for the first

4

time, and due to deliver in November 2011. In or about August or September 2011, Defendant hired a male corporate accountant, Christopher Fernandez (hereinafter "Mr. Fernandez"), who would also be taking over her responsibilities while she was on maternity leave.

24.     Even though Mr. Fernandez was given the exact same tasks and responsibilities as Plaintiff, and even though he was less experienced than Plaintiff, he was given the title of Senior Corporate Accountant, rather than Corporate Accountant, Plaintiff worked for the company after she gave birth.

25.     While Plaintiff was training Mr. Fernandez, he told her that he had been advised that when she returned from maternity leave, he would be her supervisor.

26.     Upset and humiliated, Plaintiff informed Joe Spano (hereinafter "Mr. Spano"), the Controller, of his comment, and asked him if it was true. Rather than denying that this would occur, Mr. Spano simply said that Plaintiff still reported to Mr. Spano and "not to worry about it."

27.     In addition, upon information and belief, Mr. Fernandez's starting salary was $88,000, while Plaintiff's starting salary was $60,000.

28.     While on maternity leave, Plaintiff feared that Defendant would replace her with Mr. Fernandez, whom she had trained on all of her tasks. She suffered severe anxiety throughout her leave about the possible loss of income.

29.     Plaintiff was very relieved when she heard that Mr. Fernandez quit the firm shortly before she was due to return because she knew that Defendant would desperately need her to return to work.

30.     Plaintiff returned to her job on or about February 2012.

31.     Upon information and belief, Plaintiff would have been fired or demoted if her male replacement had not quit.

5

## Plaintiff is Repeatedly Denied a Promotion

32.     Upon her return, Plaintiff went out of her way to work harder than ever to counteract the oft express belief that new mothers didn't care about their jobs. She was told by one of her co-workers not to be upset about being sidelined, because women "stop caring about their career after they have kids." Plaintiff strongly expressed her disagreement to the generalization and stated that she did care about her career.

33.     Following her many years of loyal service, in 2014 and 2015, Plaintiff asked Mr. Spano to promote her from Corporate Accountant to Senior Corporate Accountant. Mr. Spano stalled, telling her that she was "on track" to becoming a Senior Corporate Accountant, to keep doing what she was doing, and finally that "maybe [she] would be promoted the next year."

34.     Plaintiff inquired as to how her less experienced male replacement had been named Senior Corporate Accountant in 2011, but Defendant refused to explain their decision-making to Plaintiff.

35.     Upon information and belief Beth Mohr, the only other female Corporate Accountant in her department, worked for Defendant for 17 years and never received the title of Senior Corporate Accountant. However, as mentioned previously, Mr. Fernandez, who was younger and less qualified than Plaintiff, was hired as a Senior Corporate Accountant in 2011.

36.     Plaintiff was repeatedly upset when she saw upper-level male colleagues go to lunch with only other male employees. Another female employee, who had been at the firm for over 30 years, was visibly upset when the men left for one of these lunches, and told Plaintiff that she was "amazed" that Defendant never got in trouble for their discrimination or their lack of gender diversity in the management level at the firm.

37.     In addition, Plaintiff saw that Robert Kincel (hereinafter "Mr. Kincel"), Chief Financial Officer, attended expensive corporate retreats that, upon information and belief, no

female employees were invited on. Upon information and belief, Defendant finally hired their first female manager approximately one year ago, however, that particular female employee was not named a Senior Vice President, and she was forced to sit in a cubicle while her (all Caucasian) male "counterparts" had offices.

### Defendant Receives Positive Reviews, Raises and Bonuses

38.     Following her first maternity leave, Plaintiff worked twice as hard to ensure that her supervisors did not resent that she had taken maternity leave.

39.     Despite the pressure on her when she returned from maternity leave, in 2012, 2013, 2014, and 2015, Plaintiff earned positive evaluations. Plaintiff received a "3" or "Good" overall review, and she was told that she succeeded in all aspects of her performance. She also received "Award Letters" with accompanying salary raises and bonuses each year for her efforts. For example her:

- 2010 "Award Letter" provided a $2,500.00 bonus and salary increase;

- 2011 "Award Letter" provided a $2,500.00 bonus and salary increase. (Notably, Charging Party was on her first maternity leave during this time, and thus was the ONLY year that her bonus did not increase. Charging Party alleges that her bonus would have increased if she had not become pregnant);

- 2012 "Award Letter provided a $5,000.00 bonus and salary increase;

- 2013 "Award Letter" provided a $6,000.00 bonus and salary increase;

- 2014 "Award Letter" provided a $9,000.00 bonus and salary increase.

### Plaintiff Hides Her Second Pregnancy to Avoid Discrimination, and Receives a Great Review

40.     In February 2012, Nick Morrello (hereinafter "Supervisor Morrello") was hired as a Senior Corporate Accountant, and he was promoted to be her supervisor as Assistant Controller later that year.

41.     On or about mid-October 2015, Plaintiff learned that she was pregnant a second

time. Plaintiff could only think of one other pregnant employee, a programmer, and she had mysteriously stopped working not long after returning from maternity leave.

42.    Plaintiff became very concerned about the impact that her pregnancy would have on her employment. She was afraid that she would lose her job, and/or that her chances for a promotion, bonus and/or annual review would be adversely affected, so she decided not to reveal her pregnancy until she had to. Plaintiff was so reluctant to reveal her pregnancy that she scheduled her doctor visits after work hours.

43.    In or about December 2015, Plaintiff received her annual review and was relieved to find that her hard work had paid off, because her overall performance score was "4," or "Exceeded Expectations." Upon information and belief, Plaintiff would not have received the accurate, high score if she had revealed her pregnancy.

44.    In addition, her "Award Letter" provided a $10,000 bonus and salary increase. She was told that all raises were cut across the board in 2015, however, Plaintiff was unable to confirm this, and upon information and belief, it was not a true statement. Upon information and belief, her male counterparts were compensated at a higher rate than she was, and awarded higher bonuses.

### Plaintiff's Pregnancy is Revealed When She Collapses in the Office

45.    On or about February 4, 2016, when Plaintiff was 18-19 weeks pregnant, she felt faint and collapsed to the floor at work (the "Incident"). She asked Supervisor Morrello to dial 911, but he instead went to get Mr. Spano and Mr. Kincel, and eventually, a nurse on duty in the building was called.

46.    Plaintiff was forced to reveal to the nurse that she was approximately 18 weeks pregnant in front of several of her co-workers. The nurse cautioned her that her blood pressure was low, and urged her to visit her obstetrician-gynecologist.

8

47. Plaintiff was humiliated and concerned that Defendant would react poorly to her pregnancy. Bizarrely, almost immediately thereafter, an employee from Defendant's New York office contacted Plaintiff and asked her how much maternity leave New Jersey employees are entitled to.

### Plaintiff is Forced to Seek a Reasonable Accommodation

48. Plaintiff's obstetrician-gynecologist told her to visit a cardiologist because of her low blood pressure. At a subsequent visit to the cardiologist, he informed her that she could have a high-risk pregnancy, and if she felt faint she must lay down at work, or work from home. The next day, she reported the doctor's orders to Mr. Kincel, Mr. Spano, and Supervisor Morrello.

### Defendant is Angered by Plaintiff's Request for a Reasonable Accommodation

49. Even though Supervisor Morrello, Mr. Spano, and Mr. Kincel had all learned of her pregnancy due to the Incident, not one of Plaintiff's supervisors congratulated or otherwise acknowledged her pregnancy, or inquired about her health or that of her baby.

50. From the moment that Supervisor Morrello found out that Plaintiff was pregnant, his attitude towards her changed. When he spoke to her, his tone was hostile, rude, and irritated. He would even go so far as to purposely slam the hallway door in her face instead of holding it open for her as he had previously done. He also began avoiding Plaintiff and refused to make eye contact with her.

51. Immediately thereafter, he also became highly critical of her work, and would force Plaintiff to re-do work that did not need to be re-done. He began regularly humiliating her in front of other people. Though she continued to try to schedule her pregnancy related doctor's appointments outside of work hours, on some occasions she was forced to schedule appointments with specialists during regular hours. When Plaintiff was absent because of a necessary doctor's appointment for her pregnancy, Mr. Morrello publicly yelled at her for missing work, and told

her that she was just "trying to get away with things" and that "[she] thought [she] could get away with anything."

52.     Although Plaintiff often suffered from morning sickness several days a week, she made a point to work as diligently as ever and to call out from work as little as possible.

53.     Because she still suffered bouts of morning sickness, Plaintiff was sometimes forced to run to the restroom. Supervisor Morrello rolled his eyes when he saw her leave her desk to use the bathroom.

54.     When Plaintiff excused herself and ran out of a meeting to throw up, Supervisor Morrello told her that if she was not "more enthusiastic about coming to work meetings perhaps [she] should look for another job."

55.     The few days that Plaintiff worked from home in accordance with her doctor's orders, Supervisor Morrello would contact her repeatedly demanding to know her work status.

56.     Plaintiff continued to work diligently on her own assignments despite her morning sickness, but Supervisor Morrello increasingly assigned her bizarre "busy" tasks - something he had not previously done, and which he knew that neither she, nor anyone else, would be capable of completing in a regular work day.

57.     Supervisor Morrello also nastily told Plaintiff that because she was going out on maternity leave in June, she would not receive a salary raise or any bonus for that year when she returned. He blatantly stated to Plaintiff, "Since you are not going to be here, you are not going to get anything."

58.     Plaintiff became more and more upset with his behavior towards her, and cried often at work during her first and second trimesters. She cried to female staff members, who consoled her.

**Supervisor Morrello Continues to Subject Plaintiff to a Hostile Work Environment**

59.    After he found out she was pregnant, Supervisor Morrello was consistently hostile and abrasive in dealing with Plaintiff.

60.    On or about April 27, 2016, Supervisor Morrello called Plaintiff into his office cubicle and angrily demanded to know when she would be taking her maternity leave. Plaintiff told Supervisor Morrello that she had informed Mr. Kincel that she hoped to work up until the day that she went into labor, so that she could spend the most time possible with the baby, thus she did not have an exact date at which she would go on leave.

61.    Supervisor Morrello interrupted and demanded that Plaintiff choose her leave date, saying that he absolutely needed to know. He told Plaintiff that HE was more stressed than she was, and that it was HE who deserved a break, not her.

62.    He then told Plaintiff that maternity leave wasn't fair to co-workers and told her that his wife was constantly covering for her co-workers who took maternity leave, and that she was the employee who deserved a "paid break," not her co-workers. Plaintiff reminded him softly that maternity leave wasn't a "paid break," it was the law. He also told Plaintiff that it was not fair to Defendant employees for Plaintiff to take maternity leave. He complained that she was leaving Defendant in a bad spot. He expressed resentment that he himself would have to cover her work. Plaintiff felt even more worried that Supervisor Morrello would try to replace her if she took her full maternity leave.

**Plaintiff Reports Her Fear of Retaliation to Management**

63.    Plaintiff, afraid that Supervisor Morrello would retaliate against her for being pregnant, informed Mr. Spano of her conversation with Supervisor Morrello, wherein he revealed his anger and resentment towards her pregnancy and maternity leave, Mr. Spano dismissed Plaintiff's concerns, telling her that Supervisor Morrello was a strange guy.

11

64.     Mr. Spano asked her how much maternity leave she was going to take, which Plaintiff found strange. When she replied that she was entitled to "24 weeks" under the law, he was visibly shocked and said to Plaintiff unhappily, "Really, that much?" He then paused and added, "Wow, that's like a half of a year."

65.     He then advised Plaintiff that she should understand why her coworkers would be angry, jealous, and upset, because no one else took that much maternity leave.

66.     Plaintiff told him that everyone in New Jersey was entitled to the same amount of leave, and that HR told her that that is the amount of time she was allowed to take.

**Plaintiff is Fearful For Her Job While on Maternity Leave**

67.     Plaintiff was put on bed rest on June 15, 2016 and she gave birth on June 28, 2016. She texted pictures and announced the birth to several employees but only one of her supervisors, Mr. Spano, even bothered to respond. Because of this cold reception, Plaintiff became increasingly concerned that Defendant was going to fire her if she stayed on maternity leave.

68.     Plaintiff was so afraid that she was going to be retaliated against for taking her maternity leave, and that she decided that she had no choice but to return from maternity leave one month early, and did so on November 1, 2016.

**Morrello Attacks Plaintiff for Pumping Her Breastmilk**

69.     Upon her return from maternity leave, Plaintiff was shocked to be greeted coldly as she thought she would be warmly welcomed for coming back early. In fact, her supervisors appeared to be disappointed that she had returned at all, and no one congratulated her on the birth, or asked about her or her baby.

70.     Despite the lackluster reception from her supervisors, Plaintiff diligently got back to work and completed her tasks with vigor - making sure that she gave 110 percent since she knew that Defendant was watching her.

71.      Plaintiff was terrified that she would be scrutinized for her need to pump breast milk during the day. She worked through her lunch breaks, and also worked on a laptop while pumping her breast milk. Still, Supervisor Morrello angrily told her that it was not acceptable that she was away from her desk while pumping and said that she was taking too many "breaks." Plaintiff had no choice but to stand up for herself by emailing him and cc:ing the Human Resources department, to remind him that pumping her breast milk was legally protected under New Jersey law, but his anger and criticism did not abate.

72.      Plaintiff again tried to appease Supervisor Morrello's anger by renting a more expensive hospital-grade breast pump so that she could pump faster, and carried the 20-pound pump to and from the office every day. Plaintiff tried to ignore the pregnancy discrimination and hostility, excelled at her work, and did everything she could to appease Supervisor Morrello.

## Defendant Hires a Senior Corporate Accountant Who is Less Qualified Than Plaintiff

73.      Before Plaintiff went on maternity leave, Defendant advertised for a full-time Corporate Accountant to join their Department. The new employee, Francis Isaac (hereinafter "Mr. Isaac"), a male, started work on December 1, the day after Plaintiff was scheduled to return from maternity leave, and one month after Plaintiff actually returned from maternity leave.

74.      Plaintiff trained Mr. Isaac in all of her tasks so that he could provide coverage if she went on vacation.

75.      Plaintiff was devastated to learn that Defendant gave Mr. Isaac the title of Senior Corporate Accountant, even though upon information and belief, he had less experience than Plaintiff or Beth Mohr, the other female Corporate Accountant.

## Plaintiff Receives a Retaliatory Annual Review, Does Not Receive a Salary Increase, and Reports This to Higher-Ups

76.      In or about early December, about one week before the annual reviews were

scheduled, Mr. Kincel told the staff in a meeting that they should talk to him if they had any concerns about their review. Plaintiff spoke to Mr. Kincel privately and expressed her fears that Supervisor Morrello would retaliate against her for taking maternity leave. She informed Mr. Kincel that before she went on maternity leave Supervisor Morrello told her she would not receive a salary increase or a bonus, and she did not think that she should be punished for taking maternity leave. She also told Mr. Kincel that Supervisor Morrello was angry at her for pumping her breast milk during the day.

77.     Mr. Kincel remarked only that it was "very brave" of Plaintiff to report this behavior to him, further causing Plaintiff concern that she would be retaliated against for reporting the illegal behavior.

78.     Just as Plaintiff had suspected, in or about mid-December of 2016, Supervisor Morrello gave her an entirely unjustified poor performance review. The review was by far the worst she had received in her long, successful career at Defendant. In addition, Defendant gave her no salary increase for that year, the first year that she did not receive an increase since she started her job, and only half of her yearly bonus.

79.     While presenting her with the review, Supervisor Morrello screamed angrily at her, detailing what was written in the report and telling her that "no one like[d her]," and that she "[wa]s difficult." Mr. Spano for the most part stayed silent. Plaintiff was too upset and humiliated to respond to Supervisor Morrello's berating, and went back to her cubicle and cried. Plaintiff was ready to quit her job - as, upon information and belief, was intended by Defendant.

80.     When Plaintiff reported to Mr. Kincel Supervisor Morrello's extremely inappropriate behavior in the review meeting and objected to the unjustified review, he refused to acknowledge her complaints. Instead, his bizarre and patronizing response was that "everyone got a bad review at one point or another," that she had "just had a bad year" and not to worry about it.

14

The only thing "bad" about Plaintiff's year was that she had been pregnant, given birth, taken maternity leave, and was breast feeding.

81.     Plaintiff additionally spoke to the Director of Human Resources, Robert Isacco, who, instead of addressing her concerns also assured her that many employees got bad reviews, and that she did not have to sign it.

### Plaintiff Continues to Fear For Her Job, and Then is Wrongfully Terminated

82.     The environment that Defendant had created for Plaintiff forced her to consider quitting the firm. She could not sleep or eat, and was extremely agitated every day at work. However, Plaintiff knew she could not quit because she needed her income to support her family. Plaintiff did the only thing she could - work as diligently and as hard as possible, completing all of her tasks.

### Defendant Tries to Force Plaintiff Out, and Fire Her When She Refuses to Quit

83.     However, the discrimination continued. On or about March 3, 2017, Plaintiff was walking with Mr. Spano after a department lunch, and he asked her if she was planning on having more children. Plaintiff was appalled at the offensive question, and was afraid to object, but made a joke saying that she would only get pregnant if she won the lottery.

84.     On or about April 28, 2017, Plaintiff saw a posting on LinkedIn, a job search website, for a new position at Defendant with a job description that exactly matched hers. Plaintiff was terrified that this meant she would soon be terminated. She waited two weeks, to see if Mr. Kincel would address the posting in their staff meetings, but he never raised the issue. She suffered severe anxiety these weeks because of the stress of not knowing whether she would be fired.

85.     On May 9, fearful for her job, Plaintiff asked Supervisor Morrello if he was happy with her performance, and he told her that she was "improving," and that she should just "keep doing what [she was] doing." He volunteered that the firm "may" be making some changes

that would concern Plaintiff, but that she should just wait it out.

86.     Increasingly terrified that the job posting meant Defendant intended to terminate her, on May 9, 2017, Plaintiff again went to meet with Mr. Kincel to report her fears. He told Plaintiff that he could not discuss the details with her without Human Resources present, but that she should return for a discussion the next day.

87.     May 10, 2017, Plaintiff was terminated for what Defendant told her was a "restructuring" of her department. At no point did Respondent tell Plaintiff that this termination was based on any alleged poor performance, but consistently praised her performance. Upon information and belief, however, the male colleague who was newly hired after she returned from maternity leave, Mr. Isaac, was not fired, and continues to work at Defendant as a Senior Corporate Accountant.

88.     Upon information and belief, Defendant replaced Plaintiff with a male, as is their preference, because males do not have childrearing responsibility, and because they favor men over women.

89.     Upon information and belief, Plaintiff was punished for becoming pregnant and was fired for her pregnancy.

### AS AND FOR THE FIRST CAUSE OF ACTION
### (Gender and Pregnancy Discrimination in Violation of Title VII and the Pregnancy Discrimination Act)

90.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

91.     Defendant has discriminated against Plaintiff in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"), and the Pregnancy Discrimination Act, by subjecting her to different treatment on the basis of her gender and status as a pregnant woman. Plaintiff has suffered both disparate impact and disparate

treatment as a result of Defendant's wrongful conduct.

92.     Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-pregnant employees and by subjecting her to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination on the basis of her sex and status as a pregnant woman in violation of Title VII and the Pregnancy Discrimination Act.

93.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

94.     By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII and the Pregnancy Discrimination Act including an award of punitive damages. In addition, attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### AS AND FOR THE SECOND CAUSE OF ACTION
### (Gender and Pregnancy Discrimination in Violation the New York Executive Law)

95.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

96.     Defendant has discriminated against Plaintiff in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting her to different treatment on the basis of her gender and status as a pregnant woman.

97.     Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-pregnant employees and by subjecting her to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of New York Executive Law.

98.     As result of Defendant's conduct alleged in this complaint, Plaintiff has suffered

and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

99.     By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York Executive Law.

## AS AND FOR THE THIRD CAUSE OF ACTION
### (Gender and Pregnancy Discrimination in Violation the New York City Administrative Code)

100.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

101.    Defendant has discriminated against Plaintiff in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting her to different treatment on the basis of her gender and status as a pregnant woman.

102.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-pregnant employees and by subjecting her to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of New York City Administrative Code.

103.    As a result of Defendant's conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

104.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Retaliation in Violation of Title VII and the Pregnancy Discrimination Act)

105.    Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every aforementioned paragraph as if fully set forth herein.

106.    Plaintiff repeatedly voiced concerns to Defendant about Defendant's discriminatory treatment of her.

107.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to the denial of a promotion, a hostile work environment, disparate treatment, a retaliatory poor evaluation, and a termination of Plaintiff's employment.

108.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

109.    As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

110.    By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII and the Pregnancy Discrimination Act, including an award of punitive damages. Attorney's fees should be awarded under 42 U.S.C. § 2000e-5(k).

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Retaliation in Violation of New York Executive Law)

111.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

112.    Plaintiff repeatedly voiced concerns to Defendant about Defendant's discriminatory treatment of her.

113.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to the denial of a promotion, a hostile work environment, disparate treatment, a retaliatory poor evaluation, and a termination of Plaintiff's employment.

114.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

115.     As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

116.     By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of New York Executive Law. Attorney's fees should be awarded under the New York Executive Law.

### AS AND FOR THE SIXTH CAUSE OF ACTION
**(Retaliation in Violation of New York City Administrative Code)**

117.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

118.     Plaintiff repeatedly voiced concerns to Defendant about Defendant's discrimination.

119.     In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to the denial of a promotion, a hostile work environment, disparate treatment, a retaliatory poor evaluation, and a termination of Plaintiff's employment.

120.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

121.     As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

122.     By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of New York City Administrative Code, including an award of punitive damages.

Attorney's fees should be awarded under the New York City Administrative Code.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### (Discrimination in Violation of the Americans with Disabilities Act)

123.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

124.    Plaintiff was, at relevant times, a disabled individual as defined by the ADA, and is therefore a member of a protected class.

125.    As set forth in detail above and herein, Defendant subjected Plaintiff to disparate treatment on the basis of her disability.

126.    The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment and culminated in Plaintiff's discriminatory termination.

127.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

128.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption

129.    The conduct described above constituted unlawful discrimination against Plaintiff in violation of her rights under the ADA.

130.    Accordingly, Defendant discriminated against Plaintiff by virtue of treating Plaintiff less well than her similarly situated colleagues outside her protected class in violation of her statutory rights as guaranteed by the ADA.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### (Hostile Work Environment under the Americans with Disabilities Act)

131.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

132.    Plaintiff is a disabled individual as defined by the ADA, and is therefore a member of a protected class.

133.    Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant

134.    As set forth herein and above, Defendant subjected Plaintiff to a hostile work environment on the basis of her disability.

135.    The discrimination Plaintiff suffered while employed with Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

136.    The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment and culminated in her unlawful discharge.

137.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

138.    Accordingly, Defendant discriminated against Plaintiff by virtue of subjecting Plaintiff to a hostile work environment on the basis of her disability in violation of her statutory rights as guaranteed by the ADA.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (Retaliation Under the Americans with Disabilities Act)

139.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

140.    Plaintiff is a disabled individual as defined by the ADA, and is therefore a member of a protected class.

141.    As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her disability in violation of Plaintiff's statutory and constitutional rights.

142.    Plaintiff complained to Defendant multiple times regarding the rampant discrimination she was subjected to during her employment at Defendant.

143.    In response to Plaintiff's complaint, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to the denial of a promotion, a hostile work environment, disparate treatment, a retaliatory poor evaluation, and a termination of Plaintiff's employment.

144.    Accordingly, Defendant, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaint of discrimination and a hostile work environment.

145.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

146.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

147.    Accordingly, Defendant retaliated against Plaintiff in violation of her statutory rights as guaranteed by the ADA.

## AS AND FOR THE TENTH CAUSE OF ACTION
### (Failure to Accommodate under the Americans with Disabilities Act)

148.    As set forth in detail above and herein, Plaintiff is a disabled individual as defined by the ADA, and is therefore a member of a protected class.

149.     As set forth in detail above and herein, one symptom of Plaintiff's disability is her pregnancy, and complications from her pregnancy, including collapsing on the floor and feelings of morning-sickness.

150.     Defendant was aware and on notice of Plaintiff's disability and the symptoms thereof.

151.     Plaintiff requested a reasonable accommodation in the form of working from home, as per her doctor's orders.

152.     In response, Defendant refused Plaintiff's request for a reasonable accommodation and refused to participate in any interactive discussion or process to determine a different accommodation to assist Plaintiff and address her disability in the workplace.

153.     Accordingly, Defendant discriminated against Plaintiff by virtue of failing to accommodate her known disability and failing to engage in an interactive process in violation of the ADA.

## ELEVENTH CAUSE OF ACTION
### *Gender and Pregnancy Discrimination (Under New Jersey State Law Against Discrimination)*

154.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

155.     Plaintiff suffered adverse employment actions due to the fact that she is a female.

156.     Plaintiff suffered adverse employment actions due to the fact that she was pregnant.

157.     Upon information and belief, Defendants terminated Plaintiff because of her gender, her pregnancy and her status as a caregiver.

158.     Plaintiff was qualified to, able to and did perform the essential functions of her position.

159.     By the aforementioned actions, Defendants have discriminated against Plaintiff in the terms, conditions, and privileges of his employment, on the basis of her gender, pregnancy and

24

status as a caregiver in violation of the New Jersey Law Against Discrimination.

160.   As a result of the discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to her reputation and career.

161.   By reason of the foregoing, Defendants are liable to Plaintiff in an amount to be determined at trial, for back pay, reinstatement or front pay, lost benefits, liquidated damages, pre-judgment interest, attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

162.   (i)   On the First Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined at trial but in any case no less than $1,000,000.

163.   (ii)   On the Second Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined at trial but in any case no less than $1,000,000.

164.   (iii)   On the Third Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

165.   (iv)   On the Fourth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

166.   (v)   On the Fifth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

167.   (vi)   On the Sixth Cause of Action, awarding Plaintiff compensatory damages in

an amount to be determined trial but in any case no less than $1,000,000;

168.   (vii)   On the Seventh Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

169.   (vii)   On the Eighth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

170.   (vii)   On the Ninth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

171.   (vii)   On the Tenth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

172.   (vii)   On the Eleventh Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case no less than $1,000,000;

173.   (viii)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
       August 6, 2018

                              GODDARD LAW, PLLC
                              Attorney for Plaintiff

                              By:___*Megan Goddard*___
                                   Megan Goddard, Esq.
                              39 Broadway, Suite 1540
                              New York, NY 10006
                              Ofc: 646.504.8363
                              Fax: 212-473-8705
                              Megan@goddardlawnyc.com