UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

IRENE TSEPENYUK,

                         Plaintiff,

       -against-

FRED ALGER & COMPANY, INC.,

                   Defendant.

:      <u>MEMORANDUM DECISION &</u>
:            <u>ORDER</u>
:       18 Civ. 7092 (GBD)

------------------------------------ X

GEORGE B. DANIELS, District Judge:

       Plaintiff brings this gender and pregnancy discrimination, hostile work environment, and retaliation action against Defendant pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Pregnancy Discrimination Act ("PDA"), the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ( "NYSHRL"), the New York City Human Rights Law, Admin. Code § 8-107 et seq. ("NYCHRL"), the Americans with Disabilities Act ("ADA"), and New Jersey State Law Against Discrimination ("NJLAD"). (Compl., ECF No. 4.) Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56. (Def. Mem. of Law in Supp. of its Mo. for Sum. J. ("Def. Mem."), ECF No. 90.) Defendant's motion for summary judgment is GRANTED.

## I.     FACTUAL BACKGROUND

       Plaintiff began working as a Corporate Accountant at Defendant, Fred Alger & Company, Inc. ("Fred Alger"), in August 2010. (Def. 56.1 Stmt. ¶ 34.) Defendant operates as a broker dealer and has subsidiary entities that operate as investment advisors. (*Id.* ¶ 1.) Robert Kincel ("Kincel"),

1

worked as the Senior Vice President and Chief Financial Officer and led the Corporate Accounting Group. (*Id.* ¶ 32.) Joseph Spano ("Spano") worked as the Vice President and Controller and was the next senior member of the Corporate Accounting Group. (*Id.* ¶ 33.) Senior Corporate Accountants in the group oversaw the Corporate Accountants. (*Id.* ¶ 23.) In 2011, Defendant began to increase the size and sophistication of its Corporate Accounting Group to meet the company's changing needs. (*Id.* ¶ 60.) In February 2012, Nick Morrello ("Morrello") was hired as a Senior Corporate Accountant and was promoted to Assistant Controller in 2014. (Pl. 56.1 Stmt. ¶ 191.) While Plaintiff never applied for promotion to Senior Corporate Accountant, she asked Spano to promote her in 2014 and 2015. (Def. 56.1 Stmt. ¶ 105; Pl. Cstmt. to Def. 56.1 Stmt. ¶ 105.1.) Plaintiff's overall end of year performance evaluations between 2010 and 2015 were generally average — 3's (which stood for "Good") on a scale of 1-5. (Sekel Decl. Exs. 16-21.)

Plaintiff's first child was born in November 2011. (Def. 56.1 Stmt. ¶ 147.) Plaintiff learned of her second pregnancy in October 2015. (Pl. 56.1 Stmt. ¶ 198.) Effective January 1, 2016, Morrello became Plaintiff's direct supervisor and in late January 2016 he held a meeting with Plaintiff and co-worker Beth Mohr ("Mohr")[1]. (*Id.* ¶¶ 208, 213.) During this meeting, Plaintiff informed Morrello that she was pregnant. (*Id.* ¶ 216.) Plaintiff asserts, and Defendant disputes, that she communicated that she was having a "high risk" pregnancy[2] and, in response to Plaintiff's

---

[1] Plaintiff utilizes co-worker Mohr as a comparator in her discrimination claims. Mohr began working at Fred Alger in 1999. (Pl. 56.1 Stmt. ¶ 39.) Before Plaintiff and Morrello began working there, Mohr had given birth twice and took two maternity leaves. (Def. 56.1 Stmt. ¶ 127.) Mohr served as a Corporate Accountant and as a back-up to the Accounts Payable Supervisor. (*Id.* ¶¶ 42-43; Magnuson Decl. Ex. N.) Defendant asserts that Mohr's responsibilities were not the same as Plaintiff's, yet Morrello admits that "their skill sets were similar." (*Id.* ¶ 44; Magnuson Decl. Ex. B at Morrello Tr. 26:25-27:2.)

[2] Plaintiff represents that she had "complications of pregnancy that required an accommodation". (Pl. Cstmt. to Def. 56.1 Stmt. ¶ 141.1.) However, the evidence cited by Plaintiff and executed by her health care provider does not detail what complications she had with this second pregnancy. (*See* Magnuson Decl.

news, Morrello "rolled his eyes at Plaintiff and stated the meeting was over." (*Id.* ¶¶ 216, 218.)

After this meeting, Morrello began sending emails to himself about Plaintiff that he did not share

with anyone. (*Id.* ¶ 222.) Defendant contends this was to document Plaintiff's "errors and lack of

understanding and to 'start her review.'" (*Id.* ¶¶ 222, 244.)   On February 4, 2016, some of

Plaintiff's co-workers became aware of her second pregnancy when she fainted and collapsed at

work. (*Id.* ¶¶ 224, 227.)   Subsequently, at the advice of her doctor, Plaintiff began working from

home which Defendant permitted. (*Id.* ¶ 230.) Plaintiff maintains that from the moment he learned

Plaintiff was pregnant, Morrello's attitude changed. (*Id.* ¶ 235.)   For example, she claims that (1)

Morrello's tone was hostile, rude, and irritated; (2) he purposefully slammed a hallway door in her

face instead of holding it open like he had previously done; (3) Morrello and Spano never

congratulated Plaintiff on her pregnancy; (4) Morrello avoided Plaintiff and refused to make eye

contact; (5) Morrello was highly critical of her work and publicly yelled at her for missing work

after she was absent for a pregnancy related doctor's appointment; and (6) when Plaintiff was

working from home, Morrello repeatedly contacted her inquiring about her work. (*Id.* ¶¶ 231, 235,

236, 237.)   Defendant disputes all of Plaintiff's characterization of Morrello's attitude.   Plaintiff

also claims that before he knew about Plaintiff's pregnancy, Morrello told Plaintiff that he and his

wife were dealing with fertility issues. (*Id.* ¶ 210.)   In a meeting on April 25, 2016, Plaintiff

informed Morrello that she hoped to work until she went into labor and, thus, did not have an exact

date at which she would go on maternity leave. (*Id.* ¶ 247.)   Plaintiff asserts that Morrello

demanded an exact date and told Plaintiff that "he was more stressed than she was, and that it was

he who deserved a break, not her." (*Id.* ¶ 248.)   Plaintiff also contends that Morrello called

---

Exs. S, T.)  Defendant insists that Plaintiff never provided Fred Alger with any proof that she suffered from any ADA disability and that she was permitted to work from home and take breaks. (Def. 56.1 Stmt. ¶¶ 141, 142.)

maternity leave a "paid break", which Defendant disputes.  (*Id.* ¶ 251.)   Eventually, Plaintiff told

Spano about her conversation with Morrello.[3]  (*Id.* ¶ 254.)  Spano, Plaintiff claims, dismissed her

concerns and called Morrello a "strange guy."  (*Id.*)  Defendant asserts that Plaintiff complained

to Spano regarding Morrello's comments on her work performance, not her pregnancy.  (*Id.*)

Plaintiff's 2016 overall performance review, which was prepared by Morrello in December 2016,

was "Needs Improvement" – a "2" on the 1-5 scale.  (Sekel Decl. Ex. 22.)

In early 2016, Hal Liebes ("Liebes"), Chief Legal Officer and Chief Operating Officer,

instructed Kincel to put together a development plan for the Corporate Accounting Group.  (Def.

56.1 Stmt. ¶ 77; Pl. Cstmt. to Def. 56.1 Stmt. ¶ 77.1.)  Liebes believed that the group needed more

sophistication to ensure that all team members could effectively provide the complex reports and

other information requested by Fred Alger management.  (Def. 56.1 Stmt. ¶ 79.)  Kincel prepared

a Corporate Accounting Personnel Plan (the "Plan") which addressed the career paths for all

members of the Corporate Accounting Group.  (*Id.* ¶¶ 83, 85.)  The Plan, which was emailed from

Kincel to Robert Isacco (Senior Vice President and Director of Human Resources) on May 19,

2016, identified Plaintiff for termination:

> **Irene Tsepenyuk**: To be replaced with Low level Corporate Accountant as part of
> overall group reorganization. Replacement should be less expensive. Work will
> include journal entries, reconciliations, account analysis, reporting, etc. [4]

(*Id.* ¶¶ 83, 84; Magnuson Decl. Ex. N.)  Defendant contends that Kincel never shared the Plan with

Morrello or Spano, and neither participated in the decision to terminate Plaintiff.  (Def. 56.1 Stmt.

---

[3] The evidence is not clear exactly when this conversation between Plaintiff and Spano took place.  Spano
did testify that "she mentioned that [Morrello] may have alluded to her being pregnant and she wasn't
carrying her weight, I believe that was in the complaint." (Sekel Reply Decl. Ex. 3, 34:21-24.)

[4] During deposition, Kincel testified that "Plaintiff never seemed particularly engaged in her job, made
repeated mistakes, did not accept constructive criticism, and never sufficiently learned [Defendant's]
business."  (Def. 56.1 Stmt. ¶ 89.)

¶¶ 93-95.) Plaintiff disputes this but fails to cite to evidence that demonstrates otherwise. For example, an October 3, 2016 email between Kincel, Liebes, and Issaco (that Plaintiff cites) shows that the retirement and replacement of *another* Fred Alger employee was discussed with Spano—not Plaintiff's termination. (*See* Pl. Cstmt. to Def. 56.1 Stmt. ¶¶ 94.1-94.2; Magnuson Decl. Ex. J.) This email is after the Plan was developed. Moreover, that Kincel utilized Plaintiff's "reviews over time" to make the decision to terminate her does not mean, as Plaintiff seemingly suggests, that he used her December 2016 review which was created after the Plan was developed. [5] (*See* Pl. Cstmt. to Def. 56.1 Stmt. ¶ 95.1.)

On June 28, 2016, Plaintiff gave birth to her second child and returned from maternity leave on November 1, 2016. (Pl. 56.1 Stmt. ¶ 269.) Plaintiff claims that around early December 2016, she spoke with Kincel about her fears that Morrello would retaliate against her for taking maternity leave, and that "Morrello was angry at her for pumping her breast milk during the day." (*Id.* ¶ 286.) She contends she told Kincel that Morrello "told her she would not receive a salary increase or bonus" before she took maternity leave. (*Id.*) Defendant disputes this and asserts that Plaintiff spoke to Kincel after her 2016 evaluation only to object to how the quality of her work was characterized in that evaluation—not about her fear of retaliation, Morrello's anger, or any unfair treatment. (Def. Cstmt. To Pl. 56.1 Stmt. ¶¶ 286, 287.) Further, Plaintiff asserts that she spoke with Isacco, "who, instead of addressing her concerns also assured her that many employees got bad reviews. . . ." (Pl. 56.1 Stmt. ¶ 291.) Defendant disputes this fact insofar as it is not supported by the cited evidence.

---

[5] Plaintiff also cites to a page (Morrello Tr.356) from Morrello's deposition transcript that is not included in Magnuson Decl. Ex. B.

When she returned from maternity leave, Plaintiff began pumping breastmilk while at work and the human resources department was aware of this. (*Id.* ¶¶ 272, 274.)   Defendant asserts that Plaintiff never reported to Defendant's Chief Legal Officer or the Director of Human Resources (1) any pregnancy related discrimination or unfair treatment; (2) that she was denied breaks to express breast milk or the private space to do so; nor (3) that she experienced discriminatory or otherwise unfair treatment in connection with her employment at Fred Alger. (Def. 56.1 Stmt. ¶¶ 145, 152, 153.)  Plaintiff disputes these facts citing to evidence that she copied human resource employee Samantha Winters ("Winters") on a December 14, 2016 email to Morrello.  (Magnsum Decl. Ex. L.)  In the email, Plaintiff wrote "Nick, I know I told you verbally but I wanted to clear things up, if you have any questions please follow-up with HR. Thanks" and then includes the text of New Jersey's Workplace Pumping Law.   (Pl. Cstmt. to Def. 56.1 Stmt. ¶¶ 145.1, 153.1; Magnsum Decl. Ex. L.)  In her deposition testimony, Winters did not recall a conversation with Isacco about Plaintiff regarding maternity leave or breast pumping, but she did recall forwarding Plaintiff's December 14, 2016 email to Isacco.  (Magnsum Decl. Ex. E.)

In April 2017, Plaintiff saw a posting on LinkedIn, a job search website, for a new position at Fred Alger with a job description that exactly matched hers.  (Pl. 56.1 Stmt. ¶ 294.)  On May 10, 2017, Plaintiff was terminated.  (*Id.* ¶ 297.)  Plaintiff's position was filled by Ian Daly, a male.  (*Id.* ¶ 298; Def. 56.1 Stmt. ¶ 117.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d

Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material

when "it 'might affect the outcome of the suit under the governing law.'" *Gayle*, 313 F.3d at 682

(quoting *Anderson*, 411 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine

issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.

2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine

issue of material fact. To do so, it "must do more than simply show that there is some metaphysical

doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely

on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247

F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Only

admissible evidence need be considered by the trial court in ruling on a motion for summary

judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

In determining whether a genuine issue of material fact exists, the court must construe the

evidence in the light most favorable to the opposing party and draw all inferences in that party's

favor. *See Niagara*, 315 F.3d at 175.  However, "a court must not weigh the evidence, or assess

the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir.

2016) (internal citations omitted).

### III.    SUMMARY JUDGMENT IS GRANTED

#### A. Discrimination Under Title VII, NYSHRL, and NJLAD

Plaintiff failed to establish discrimination under Title VII, NYSHRL, and NJLAD.  A

plaintiff makes out a *prima facie* case of discrimination by showing that: (1) she belongs to a

protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse

employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *Espinoza v. New York City Dep't of Transportation*, 304 F. Supp. 3d 374, 387 (S.D.N.Y. 2018); *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) ("All retaliation and discrimination claims brought under Title VII, NYSHRL, and the NJLAD, including those based on sex, race, and disability, which rely on circumstantial evidence, are controlled by the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*.") If a plaintiff successfully presents a *prima facie* case, the burden shifts to defendant to proffer one or more legitimate, non-discriminatory reasons for the adverse employment action. *Id*. To prevail on her case, the plaintiff must then demonstrate that the proffered reason or reasons are a pretext for discrimination. *Id*. (citing *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013)). A plaintiff proves an employer's reasons are a pretext for discrimination by showing the reason was false and that discrimination was the real reason. *Cargian v. Breitling USA, Inc.*, No. 15 CIV. 1084 (GBD), 2021 WL 4780327, at \*10 (S.D.N.Y. Sept. 13, 2021) (citations omitted). She may also show "that discrimination was a 'motivating factor' in the employer's mind. To show that discrimination was a motivating factor in [an] adverse employment action, plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support [her] allegations of discriminatory treatment." *Id.* (citations omitted).

### a. Plaintiff's *Prima Facie* Burden is Satisfied

While Defendant contends otherwise, Plaintiff was a member of a protected class as a pregnant woman. *See Paulson v. Tidal*, No. 16-CV-09049-LTS-OTW, 2018 WL 3432166, at \*2 (S.D.N.Y. July 16, 2018) ("Title VII, as amended by the Pregnancy Discrimination Act, defines the phrases 'because of sex' and 'on the basis of sex' to include 'because of or on the basis of pregnancy ... or related medical conditions.'") She was also qualified for her position as a

8

Corporate Accountant and her satisfactory performance evaluations do not establish otherwise. *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 127 (E.D.N.Y. 2011) (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir.1991)) ("[T]he plaintiff need make only a minimal showing of qualification, that is, that she possesses the basic skills necessary for performance of [the] job."). As to the third element, Plaintiff asserts that her negative employment review and her eventual termination constituted adverse employment actions.[6]

On December 16, 2016, Plaintiff received an overall annual performance rating of "Needs Improvement." (*See* Sekel Decl. Ex. 22.) However, as Plaintiff acknowledges, a negative performance review "must trigger negative consequences to the conditions of employment" to constitute an adverse employment action. (Pl. Opp'n. to Def. Mo. for Summ. J. ("Pl. Opp'n.") at 21.) It is undisputed that the decision to terminate Plaintiff was approved in May 2016, but she was not officially terminated until May 10, 2017. (*See* Def. 56.1 Stmt. ¶ 92 ("Kincel presented the plan to Liebes in May 2016; Liebes approved the Plan and told Kincel he could begin implementing it as appropriate"); Sekel Decl. Ex. 1, Liebes Tr. 108:15-19 (Chief Legal Officer and Chief Operating Officer explaining how an implementing termination determination, which involved finding a new hire, takes time.)) Thus, Plaintiff's negative performance review could not have "triggered" her termination because the decision to terminate Plaintiff had been made months prior. The decision to terminate Plaintiff was not a discriminatory adverse employment action.[7]

---

[6] Plaintiff also asserts that the "disparate treatment in comparison to her non-pregnant and non-lactating comparators (Beth Mohr) and male counterpart, Isaac" was itself an adverse employment action. (Pl. Opp'n. at 20-21.) The one case Plaintiff cites for this proposition does not support this argument.

[7] To the extent that Plaintiff proffers that she was denied a promotion to Senior Corporate Accountant, the undisputed facts show that she never actually applied for the position and instead only asked Mr. Spano to promote her. (Pl. Cstmt. to Def. 56.1 Stmt. ¶ 105.1; *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 846 (S.D.N.Y. 2013) (A plaintiff must prove that she "applied and was qualified for a job..." for discrimination based on failure to promote.))

9

Finally, the general circumstances surrounding the decision to terminate and the eventual termination of Plaintiff—the purported change in her supervisor's attitude (Compl. ¶ 59) and getting dismissed for complaining about her experiences (Compl. ¶ 63)—may meet the *de minimis* burden required for an inference of discriminatory intent under Title VII, NYSHRL, and NJLAD.

### b. **Defendants Successfully Provided a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination**

Defendant proffers that "Plaintiff's underwhelming performance and stagnant development in the face of a more challenging and demanding work environment" constitutes a legitimate, nondiscriminatory reason for her termination. (Def. Mem. at 17.) Kincel believed that Plaintiff never seemed particularly engaged in her job, made repeated mistakes, did not accept constructive criticism, and never sufficiently learned Alger's business. (Def. 56.1 Stmt. ¶ 89.) Further, Plaintiff's performance reviews were no more than average. (Sekel Decl Exs. 16-21.) It is also undisputed that Defendant sought to increase its business sophistication during the time Plaintiff was employed. (Def. 56.1 Stmt. ¶¶ 60-76.) This evidence, in totality, is sufficient to establish that Plaintiff's termination was due to her underwhelming performance, particularly in light of Defendant's changing business.

### c. **Plaintiff Has Not Demonstrated that Defendant's Non-Discriminatory Reasons Were a Pretext for Discrimination**

Plaintiff argues that Morrello's comments and her treatment in comparison to non-pregnant co-worker, Beth Mohr, establish that Defendant's proffered nondiscriminatory reason was a pretext for discrimination. (Pl. Opp'n. at 22-24.) Defendant contends that Morrello's comments were insufficient to support a finding of discriminatory intent, were made more than eleven months before Plaintiff was terminated, and that Morrello was not responsible for the decision to terminate

Plaintiff. (Def. Mem. at 13-16.) Defendant also argues that Beth Mohr was not a suitable comparator for Plaintiff. (*Id.*)

Even in a light most favorable to Plaintiff, the evidence does not suggest that Morrello had anything to do with the decision to terminate Plaintiff. The parties do not dispute that the decision was made in May 2016 by Kincel and Leibes. (Def. 56.1 Stmt. ¶¶ 77, 92.) There is also no dispute that Morrello's negative review of Plaintiff was drafted in November 2016 and finalized in December 2016. (Sekel Dec. Ex. 22.) Thus, Morrello's review could not have impacted the decision to terminate Plaintiff. Moreover, besides Plaintiff's assertion that Morrello publicly yelled at her (Pl. 56.1 Stmt. ¶ 237), the evidence does not suggest that Morrello shared his sentiments about Plaintiff with either Kincel or Leibes. To the contrary, the evidence shows that Morrello directed his criticism directly at Plaintiff and otherwise kept his sentiments about her to himself. (*Id.* ¶ 244; Def. Cstmt. To Pl. 56.1 Stmt. ¶ 244 (Morrello sent emails to himself to help start Plaintiff's review); *cf. Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 360 (S.D.N.Y. 2012) (Plaintiff's supervisor, who did not directly terminate Plaintiff, met with human resources multiple times to express concerns over Plaintiff's pregnancy, hormones, and parental obligations). Thus, while Morrello's alleged comments were derogatory, they are insufficient to override Defendant's non-discriminatory reason for terminating Plaintiff.

Plaintiff uses Beth Mohr as a comparator to establish that a non-pregnant, similarly situated person did not face discrimination. A comparator is similarly situated when she is subject to the same performance standards and engages in the same conduct. *Liu v. Indium Corp. of Am.*, No. 20-64, 2021 WL 3822871, at *2 (2d Cir. Aug. 27, 2021).

Here, the differences between Plaintiff and Mohr outweigh the similarities. While, as Plaintiff points out, Morrello did not see noticeable differences in their skill sets (Magnuson Decl.

Ex. 2, 26:25-27:2: "I'd say their skill sets were similar."), Mohr had been working at Fred Alger for ten years longer than Plaintiff. (Pl. Cstmt. to Def. 56.1 Stmt. ¶ 39.) Moreover, Spano and Kincel believed Mohr took on additional responsibilities. (Sekel Decl. Ex. 5, Spano Tr. 68:14-16: "Beth also took care of our travel and detainment module and Beth was assisting on the accounts payable"; Kincel Decl. ¶ 34 "[Beth] served as the back-up for Ms. Martin with respect to accounts payable work.") Finally, while she was not pregnant during the same timeframe as Plaintiff, Mohr had two pregnancies and two maternity leaves without incident while at Fred Alger. (Def. 56.1 Stmt. ¶ 127.)

Thus, Plaintiff has failed to establish Defendant's reasons were a pretext for discrimination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for discrimination under Title VII, NYSHRL, and NJLAD.

## B. Discrimination Under NYCHRL

Under the NYCHRL, a "plaintiff must show that [she] was treated less well than other employees' on the basis of a protected characteristic." *Syeed v. Bloomberg L.P.*, No. 1:20-CV-7464-GHW, 2021 WL 4952486, at *17 (S.D.N.Y. Oct. 25, 2021); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Summary judgment is proper only if the record establishes as a matter of law that discrimination played no role in [defendant's] actions. *Id.* "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims. . . . However, NYCHRL is not a general civility code, and petty slights or trivial inconveniences ... are not actionable. The burden remains on the plaintiff to show that the conduct is caused by a discriminatory motive." *Id.*

Differential treatment may be actionable under the NYCHRL even if it does not result in an employee's discharge. *Mihalik*, 715 F.3d at 114. "To avoid summary judgment in an

employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Colon v. Fashion Inst. of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 290 (S.D.N.Y. 2013) (quotation omitted).

Here, Plaintiff fails to establish that she was treated less well than men or even non-pregnant women. The record is devoid of details on how men were treated at Fred Alger—particularly by Morrello. Additionally, there is no evidence that any pregnant employees were treated less well than non-pregnant women. Moreover, her claims lack specificity—it is unclear how often and when, in relation to her pregnancy announcement, that Morrello yelled at Plaintiff, failed to hold the door for her, or criticized her work. Even in the aggregate, without more detail, Morrello's actions lean towards "petty slights or trivial inconveniences." Finally, the only evidence of discriminatory intent is that Morrello's attitude towards Plaintiff changed after he found out she was pregnant and that allegation lacks specificity because, again, it is unclear how soon after Plaintiff's pregnancy announcement that Morrello's attitude changed. Without that temporal proximity, Morrello's attitude and actions have no correlation to pregnancy contempt. Plaintiff fails to establish a claim under NYCHRL.

## C. Retaliation Under Title VII, NYSHRL, and ADA

Plaintiff failed to establish retaliation under Title VII, NYSHRL, and the ADA. A *prima facie* retaliation claim requires a plaintiff to show that (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exist[ed] between the alleged adverse action and the protected activity." *Aiken v. MTA New York City Transit*, et al., No. 18CV11756GBDDF, 2021 WL

13

4481094, at \*4 (S.D.N.Y. Sept. 29, 2021); *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 56 (E.D.N.Y. 2021).

"An employee engages in a protected activity when [she] complains of an employment practice that she reasonably believes violates the law. Where the discriminatory nature of the complaint is not readily apparent, [t]he onus is on the speaker to clarify to the employer that [she] is complaining of unfair treatment due to [her] membership in a protected class and that [she] is not complaining merely of unfair treatment generally." *Mauro v. New York City Dep't of Educ.*, No. 19CV04372GBDKHP, 2020 WL 5899522, at \*7 (S.D.N.Y. Apr. 29, 2020), *report and recommendation adopted*, No. 19CIV4372GBDKHP, 2020 WL 3869206 (S.D.N.Y. July 9, 2020) (quotation omitted).

Retaliation claims require a heightened standard of causation than discrimination claims, namely, that the protected activity was a "but-for" cause of the retaliation. *Aiken*, 2021 WL 4481094, at \*4. A causal connection between the protected activity and the adverse action may be demonstrated by showing (1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities. *Dudley v. New York City Hous. Auth.*, No. 12 CIV. 2771 PGG, 2014 WL 5003799, at \*26 (S.D.N.Y. Sept. 30, 2014).

Here, Plaintiff argues that she told Spano about her conversation with Morrello "wherein [Morrello] revealed his anger and resentment towards her pregnancy and maternity leave." (Def. Cstmt. To Pl. 56.1 Stmt. ¶ 254.) Defendant asserts that Plaintiff's pregnancy never came up in the discussion—only Plaintiff's work performance. (*Id.; see also* Magnuson Decl. Ex. C, Spano Tr. at 32:5-24.) Plaintiff also claims that she told Kincel of "her concerns" that "Morrello would retaliate against her for taking maternity leave" in early December 2016. (Pl.'s Opp'n. at 29; Pl.

14

56.1 Stmt. ¶ 286), but Kincel asserts that the two only discussed Plaintiff's 2016 review (Sekel Decl. Ex. 11 at 25:12-16: "I remember she -- she was unhappy with her review. She came in to tell me she was unhappy about it and she disagreed with it. And she didn't want to sign it.") Finally, Plaintiff argues that she emailed Winters in Human Resources with her claims of discrimination with her lactation accommodation. (P.'s Opp. at 29; Pl. Cstmt. To Def. 56.1 Stmt. ¶¶ 145.1 and 153.1; Magnsum Decl. Exs. E, L.)

Plaintiff failed to establish her retaliation claim. Even if the evidence was sufficient to establish that she engaged in protected activity, Spano and Winters were not decision-makers in Plaintiff's termination. Moreover, Plaintiff's conversation with Kincel occurred well after the decision to terminate her was made. Thus, no "but-for" causation exists between the alleged retaliatory conduct and the decision to terminate Plaintiff.

Defendant is entitled to summary judgment on Plaintiff's claim for retaliation under Title VII, NYSHRL, and ADA.

#### D. Retaliation Under NYCHRL

Retaliation claims brought pursuant to the NYCHRL are evaluated under the same McDonnell Douglas three-step burden-shifting framework. *Marseille v. Mount Sinai Health Sys., Inc.*, No. 18-CV-12136 (VEC), 2021 WL 3475620, at *11 (S.D.N.Y. Aug. 5, 2021). However, "[u]nlike retaliation claims brought under federal and state civil rights laws, a NYCHRL plaintiff need not show a material adverse action but instead can prove a retaliation claim by demonstrating that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id.* "Protected activity under the NYCHRL includes any opposition to a discriminatory practice forbidden under the statute. This requirement is satisfied when a party communicates to the

15

employer defendant, in substance, that she believes the defendant's treatment of her is discriminatory." *Id.* "General complaints about a supervisor's behavior, when there is no indication ... that [defendants] knew or should have known that the behavior was the result of a discriminatory motive, are not protected activity. *Id.* "The burden is on the employee to make clear to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Id.*

Even under the NYCHRL, Plaintiff's conversations with Spano, Kincel, and Winters do not establish retaliation because there is no connection to the decision to terminate or any other "conduct that was reasonably likely to deter [Plaintiff]". *See Marseille*, 2021 WL 3475620, at *11 (Even if plaintiff's complaint qualified as protected activity, the process of terminating Plaintiff began before she made the complaint undermining the causal connection); *Warmin v. New York City Dep't of Educ.*, No. 16 CIV. 8044 (KPF), 2021 WL 517777, at *10 (S.D.N.Y. Feb. 11, 2021). Neither Spano nor Winters were decision makers in Plaintiff's termination, and Plaintiff spoke with Kincel after the decision had been made.

Defendant is entitled to summary judgment on Plaintiff's claim for retaliation under NYCHRL.

## E. Discrimination, Hostile Work Environment, and Failure to Accommodate Under ADA

To maintain her claims under the ADA, Plaintiff must first establish that she was disabled within the meaning of the statute, *i.e.*, that she had an actual disability as defined as a "a physical or mental impairment that substantially limits one or more major life activities," has a record of such an impairment, or is "regarded as" disabled. *See* 42 U.S.C. § 12102(1)(A), (B), and (C). *See Williams v. Geiger*, 447 F. Supp. 3d 68, 79 (S.D.N.Y. 2020). "[I]t is well established that pregnancy alone does not constitute a disability. *McMyler v. Bank of Utica*, No.

16

619CV812MADATB, 2021 WL 2778830, at *3 (N.D.N.Y. July 2, 2021). "Although complications from pregnancy may qualify as a disability in extremely rare circumstances, courts have generally held that such complications do not create a disability for purposes of the ADA." *Cooke v. Berkshire Farm Ctr. & Servs. for Youth*, No. 11-CV-2970 SJF GRB, 2012 WL 668612, at *5 (E.D.N.Y. Feb. 29, 2012).

The record does not establish that Plaintiff had any additional complications that would qualify her pregnancy under the ADA, nor is there any evidence that Defendants were aware of such complications. Plaintiff argues that she informed Morrello that she had a "high risk pregnancy", low blood pressure, and that she fainted in front of her co-workers. (Pl. 56.1 Stmt. ¶¶ 216, 224, 229, 230.) She cites to Family and Medical Leave Act forms executed by her doctor but, while her doctor proscribes "bed rest until delivery," not one of these forms states that Plaintiff's pregnancy had any complications and, in fact, her doctor even checked "no" on a form inquiring whether Plaintiff's pregnancy made her "unable to perform any of [her] job functions". (Pl. Cstmt. to Def. 56.1 Stmt. ¶ 141.1, Magnuson Decl. Exs. S, T.) Without more, Plaintiff fails to establish a disability or that Defendant perceived her to be suffering from a disability.

To the extent Plaintiff is arguing that her breast pumping and lactation constitutes a disability under the ADA, she cites no caselaw, nor is the Court aware of any precedent supporting this assertion. *Martinez v. N.B.C., Inc.*, 49 F. Supp. 2d 305, 309 (S.D.N.Y. 1999) (citing *Bond v. Sterling, Inc.*, 997 F. Supp. 306, 311 (N.D.N.Y. 1998) ("It is simply preposterous to contend a woman's body is functioning abnormally because she is lactating."); *see also Mayer v. Pro. Ambulance*, LLC, 211 F. Supp. 3d 408, 420 (D.R.I. 2016).

Thus, summary judgment is granted in favor of Defendant on Plaintiff's discrimination, hostile work environment, and failure accommodate claims under the ADA based on insufficient

17

evidence of disability. *See Boutillier v. Hartford Pub. Sch.*, 221 F. Supp. 3d 255, 274 (D. Conn. 2016).

## IV.   CONCLUSION

Defendant's motion for summary judgment dismissing all of Plaintiff's claims, ECF No. 89, is GRANTED. The Clerk of Court is directed to close the motion and case accordingly.

Dated: New York, New York

March 29, 2022

SO ORDERED.

GEORGE B. DANIELS

United States District Judge

18